Clarence MITCHELL, Aischa Mitchell, Plaintiffs–Counter–Defendants–Appellants,

v.

Sheila SHANE, Harvey Shane, Defendants–Counter–Claimants–Appellees,

Century 21 Rustic Realty, Century 21 Rustic Realty, Matthew Ryan, Defendants–Appellees.

Docket No. 02–9425.

United States Court of Appeals, Second Circuit.

Argued: Oct. 3, 2003.

Decided: Nov. 17, 2003.

Stephen T. Mitchell, Stephen T. Mitchell, P.C., New York, NY, for Plaintiffs–Appellants.

Neil J. Moritt, Moritt, Hock, Hamroff & Horowitz, LLP, Garden City, N.Y. (Ellen R. Storch, on the brief), for Defendants–Counter–Claimants–Appellees.

Douglas Falch, Penino & Moynihan, LLP, White Plains, N.Y. (Stephen J. Penino, on the brief), for Defendant–Appellee Century 21 Rustic Realty.

Thalia Feilen, Goldson, Nolan Associates LLP, Melville, N.Y. (Howard W. Goldson, of counsel), for Defendant–Appellee Matthew Ryan.

Before: CARDAMONE, MINER, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge.

Plaintiffs Clarence and Aischa Mitchell ("plaintiffs" or the "Mitchells") appeal from a decision of the United States District Court for the Eastern District of New York (Platt, *J.*), granting summary judgment to defendants Sheila and Harvey Shane (the "Shanes"), Matthew Ryan ("Ryan"), and Century 21 Rustic Realty ("Century 21"), on plaintiffs' claims of racial discrimination in connection with their unsuccessful attempt to purchase real property located at 2548 Deerfield Road, Southampton, New York (the "Property").

The Mitchells, an African–American couple, allege that they were denied, in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, 42 U.S.C. §§ 1981 and 1982, and New York Executive Law § 296(5)(a)(1), the right to purchase the Property. The district court referred the matter to Magistrate Judge William D. Wall, who held a three-day evidentiary hearing in March 2002. Adopting Magistrate Judge Wall's Report and Recommendation, the district court denied the plaintiffs' motion for a preliminary injunction to prevent the sale of the Property to Michael Selleck ("Selleck"), *see Mitchell v. Century 21 Rustic Realty*, 233 F.Supp.2d 418 (E.D.N.Y.2002) (*"Mitchell I"*), and we affirmed, 2002 WL 31006358, 45 Fed.Appx. 59 (2d Cir. Sept.6, 2002). The Shanes then moved for summary judgment on the Mitchells' housing discrimination claims, for cancellation of the Notice of Pendency filed by plaintiffs, and for sanctions and attorneys' fees against the plaintiffs and their counsel, Stephen Mitchell. Defendants Ryan and Century 21 also sought summary judgment, sanctions, and attorneys' fees. The district court granted summary judgment to all defendants, cancelled the Notice of Pendency, and deferred decision on sanctions and fees. It also denied plaintiffs' motions for the recusal of Judges Platt and Wall. *See Mitchell v. Century 21 Rustic Realty*, 233 F.Supp.2d 445 (E.D.N.Y.2002) (*"Mitchell II"*).

We affirm the denial of recusal, and the grants of summary judgment as to the claims against the Shanes. However, because we find that disputed issues of material fact preclude summary judgment as to the claims against Ryan and Century 21, we vacate and remand these for further proceedings.

## I. Background

Clarence and Aischa Mitchell, residents of New York City, began to search for a home in eastern Long Island in May 2001. Robin Kaplan ("Kaplan"), an employee of Allen M. Schneider Associates, Inc., first showed the Mitchells the Property in late

November or early December of 2001.[1] After consulting with an architect to determine whether desired changes to the Property were possible, the Mitchells made an initial offer of $655,000. On December 26, while the Mitchells were vacationing in California, they received a call from Kaplan indicating that the Shanes had received another offer on the Property, for $672,000.[2] Eager to demonstrate their genuine interest in purchasing the Property, the Mitchells authorized Kaplan to increase their offer to $685,000. Kaplan faxed a note to defendant Ryan, the listing agent on the Property. The note indicated that the Mitchells would offer that amount, "subject to engineer's report and 80% financing," with an approximate closing date of March 1, 2002.[3] The following day, Kaplan phoned the Mitchells to indicate that the Shanes were very interested in their offer, but required some evidence of the Mitchells' ability to deliver on it. The Mitchells expeditiously obtained from the Manhattan Mortgage Company a preapproval letter for financing of $616,500, which amounted to 90% of the purchase price, and had it faxed to Kaplan and Ryan on December 27.

Ryan testified that after seeing the Mitchells' preapproval letter, the Shanes expressed concern about the 90% financing figure, fearing that insufficient equity would hamper a "smooth[ ] transition." Ryan says he called Kaplan to convey this qualm, and Kaplan told him that the preapproval letter was meant merely to indicate that the Mitchells were approved for 90% financing, not to suggest that an 80%

contingency was a problem for them. Ryan subsequently issued a memorandum of sale providing for a $685,000 purchase price and 80% financing, which he sent to Kaplan, the Shanes, Marie Ongioni (the Mitchells' real estate attorney) ("Ongioni"), and Kara Bak (the Shanes' real estate attorney) ("Bak"). Kaplan apparently prepared her own memorandum of sale on December 27, containing the 80% figure, but it is not clear from the record whether she conveyed it to anyone else. On December 29, Kaplan faxed a different document, which she termed a "history sheet," to Bak, Ongioni, and Ryan; this document specified a 90% financing contingency. Kaplan testified that she changed the contingency figure from 80% to 90% based on the Mitchells' preapproval letter.

On January 3, 2002, Bak sent four copies of a contract of sale for the Property to Ongioni. An accompanying cover letter stated that if the Mitchells approved the terms, they were to sign the contracts and return them with a check for $68,500, ten percent of the proposed purchase price. The cover letter also specified that "[s]ince this is not to be considered a continuing offer to sell, if the signed contracts are not returned to my office within ten days from your receipt same [sic], then this offer shall be considered terminated without prejudice to either party." Bak's letter also requested that Ongioni telephone her before making any alterations to the contract. Ongioni apparently received the letter and the contracts on the following day, January 4.

1. Kaplan was a selling broker for the Property, which apparently means that she brought prospective buyers to the attention of the listing agent, defendant Ryan. As the listing agent for the Property, Ryan fielded, on the Shanes' behalf, offers from prospective buyers, which were often brought to him by selling brokers.

2. This offer was apparently from Selleck. It is not clear how Kaplan knew the amount, since Ryan testified that he did not tell her how much the other bidder had offered.

3. Clarence Mitchell testified that he and his wife were unaware that the standard contingency figure was 80%.

On January 5, 2002, the Mitchells brought an engineer to inspect the Property. The engineer discovered several problems with the Property, which he described in a report to the Mitchells issued on January 10. After reviewing the report, the Mitchells concluded that the necessary repairs would cost approximately $20,000 to $25,000.

Ongioni testified that she sent the contracts to the Mitchells on Friday, January 11, 2002, the day before she was to leave for a week-long vacation. She stated that she told Bak she was sending the contracts to the Mitchells for their signature, and indicated that she would be on vacation the following week, so that the signed contracts would not be returned to Bak until the week of January 21. Ongioni stated at the preliminary hearing that Bak did not object to this arrangement.

In the meantime, the Mitchells contacted Kaplan to request that she negotiate a reduction of $8,000 to $10,000 in the price of the Property to compensate for the repairs that the engineer's report suggested were necessary. Ryan, meanwhile, was vacationing in St. Croix, but according to his testimony, he was making frequent telephone inquiries regarding the status of the Shane–Mitchell contracts, since they had not yet been signed and returned. When he got home on the evening of January 14, 2002, he found a message from Kaplan on his answering machine explaining the Mitchells' request for a price reduction. Ryan testified that he immediately telephoned the Shanes to convey this proposal, and that Mr. Shane was "very frustrated" by the new demand. Despite Mr. Shane's initial reluctance to renegotiate, Ryan said he convinced the Shanes to accept an $8,000 reduction on the condition that the contracts be signed and returned by January 17. Ryan says he called Kaplan back later that night, and left a message on her answering machine with details about the price reduction and the new deadline.

Subsequently, Kaplan testified, she contacted the Mitchells to tell them that the Shanes had accepted the proposed reduction and that the contracts should be returned as soon as possible. Mr. Mitchell told Kaplan that he was in Chicago, but would be happy to sign the contracts when he returned to New York on Friday, January 18. Kaplan asked if there was anything the Mitchells could do in the interim, and they arranged to fax a signed copy of the signature page of the contract to Kaplan and Bak. On January 15, Kaplan returned Ryan's phone call. According to Ryan's testimony, Kaplan conveyed the Mitchells' thanks to him for holding the deal together, and assured Ryan that she would personally ensure that the contracts were returned to Bak by the end of the day on January 17.

Ryan testified that on January 17, 2002, he called Kaplan to inform her that the Property would remain on the market until contracts were signed, and that another real estate agency had a client interested in making an offer on the Property.

On January 18, 2002, the Mitchells obtained a certified check from Citibank for $67,700, which amounted to 10% of the renegotiated purchase price. Mr. Mitchell then modified the contracts by crossing out the $685,000 purchase price and replacing it with the renegotiated price of $677,000, and by crossing out the 80% mortgage contingency figure of $548,000 and replacing it with a 90% contingency, or $609,300. The Mitchells sent the contracts and the check to Ongioni via Federal Express on January 19.

On January 20, 2002, Gioia di Paolo of Cook Pony Farm Real Estate informed Ryan that Selleck was now prepared to offer the Shanes $685,000 with a 42%

mortgage contingency. That day, Ryan presented the Selleck offer to the Shanes. Mr. Shane indicated his preference for Selleck's offer over the Mitchells', but did not accept Selleck's offer at that time. Ryan testified that it was not his role, as the listing broker, to tell the Mitchells about the January 20 Selleck offer, and that he had fulfilled his duties to them by informing Kaplan on January 17 that there might be another potential buyer.

January 21, 2002 was Martin Luther King, Jr. Day, a national holiday. On January 22, Ryan received a preapproval letter for Selleck from IPI Skyscraper Mortgage Corporation and notified the Shanes. That day, Ongioni returned from her vacation and sent the Mitchells' contracts and check to Bak via overnight mail. Also on January 22, Ryan notified Bak that Selleck was considering the Shanes' Property.

Sometime on January 23, Ryan called Bak to tell her that the Shanes had decided to go ahead with the Mitchells' deal and that Bak should proceed accordingly. That same day, Bak received the Mitchells' check and contracts, and called Ongioni to inquire about the handwritten changes altering the 80% contingency figure to 90%. Bak testified that 80% financing was the industry standard, and that she had been unaware that the Mitchells' preapproval letter authorized 90% financing. She expressed surprise that the Mitchells had changed the term, and noted that her cover letter to Ongioni had requested advance notification of any alterations. Ongioni confirmed in her testimony Bak's impression that Ongioni, too, was surprised that the Mitchells had amended the contract.

The substance of the January 23 conversation between Bak and Ongioni is the subject of some dispute. Bak testified that Ongioni told her that the Mitchells *required* 90% financing. Ongioni stated in her testimony that she never told Bak that the Mitchells required 90% financing; rather, Ongioni claimed that she had asked Bak to call her if there was any problem with the 90% financing term, a recollection Bak disputes. Ongioni also testified that she never specifically asked Bak for an extension of time, because Ongioni assumed that (a) since the contractual terms were the subject of continuing negotiations, and (b) since Bak had never affirmatively invoked the 10–day deadline from the original letter, the timeline was now more fluid.

The following day, January 24, 2002, Ryan issued an "offer and acceptance" to Selleck, and Bak sent contracts for the sale of the Property to Selleck's attorney, Arthur Elfenbein ("Elfenbein"). Elfenbein testified that Selleck had indicated to him that the signed contracts and down payment must be returned within one day, or Selleck would lose the deal. Bak testified that her secretary had faxed the contracts to Selleck, and that the usual practice in Bak's office was to send contracts out by overnight mail.

Kaplan maintained in her testimony that sometime after January 22, she called Ryan to inquire about the status of the negotiations and the Mitchells' contract and left phone messages both for him and for his manager, Margaret Satornino ("Satornino"). Kaplan stated that she had asked Ryan whether the reason she had not heard from him was that another, better offer had been submitted on the Property. According to her testimony, he replied that he did not have to answer her questions. Kaplan said she then spoke with Satornino, who "was just as unforthcoming." Ryan testified at the evidentiary hearing that he had no obligation to tell the Mitchells about the Selleck offer on January 24 when Ryan issued the "offer and acceptance" to Selleck. Ryan reiterat-

ed that he had already informed Kaplan on January 17 of the existence of another potential buyer, and stated that he had assumed that the real estate attorneys, Bak and Ongioni, were discussing the status of the Mitchell negotiations.

On January 25, 2002, Selleck returned the signed contract and a deposit check in the amount of $68,500 to Bak. Bak testified that she did not call Ongioni to inform her of the Selleck deal, and repeated the disputed statement that Ongioni had told her that the Mitchells required 90% financing to purchase the property. On January 28, Bak sent signed copies of the Selleck contract to the Shanes.

Bak testified that she spoke with the Shanes on or about January 29, 2002, at which time the Shanes inquired as to whether the Mitchells were subject to a deadline for returning their contracts, and as to whether the Shanes could lawfully go ahead with the Selleck deal. On January 29, 2002, Bak sent the Mitchells' deposit check back to Ongioni with an accompanying letter stating that the Shanes had "not accepted the purchasers offer in that it was contingent upon the Purchaser obtaining 90% financing."

The following day, January 30, Ongioni called Bak to ask about the status of the Mitchell–Shanes contract. Bak informed her that she had returned the check and the contract the day before because of the Shanes' dissatisfaction with the mortgage contingency figure. Ongioni expressed surprise, since, as she later testified in the evidentiary hearing, her previous experience in the real estate business had been that the seller would not unilaterally return a down payment check without determining whether the prospective buyer could in fact meet the seller's terms. Ongioni told Bak she would call the Mitchells to see whether they would agree to an 80% mortgage contingency. She spoke with the Mitchells, and they authorized her to offer 80% financing. Mr. Mitchell testified that this was the first time he became aware that the financing was a sticking point for the Shanes, as he had not considered the difference between 80 and 90 percent at all significant. When Ongioni called her back, Bak indicated that she would communicate the Mitchells' offer to the Shanes, but that she did not think they would accept because they had received an offer from another potential buyer. The Shanes signed a contract with Selleck the same day.

On February 1, 2002, Ongioni called Bak again to see whether the Shanes were willing to accept the Mitchells' offer. The Mitchells, too, were anxious for news; they called Ongioni several times between January 30 and February 1 in an attempt to discover the status of the negotiations. Ongioni sent a letter to Bak dated February 1, describing their January 30 phone conversation and stating that her clients were "of the opinion that there may be certain underlying issues" that prevented the sale. She also indicated her own belief that the Shanes' unilateral rejection of the Mitchell deal without any opportunity to renegotiate was "most unusual if your client had been acting in good faith." On February 5, 2002, Bak responded to Ongioni's letter in writing, stating that her clients had rejected the Mitchell deal because of the significant delay in returning the contracts and the Mitchells' alteration of the mortgage contingency clause.

On February 7, 2002, before she received Bak's February 5 letter, Ongioni sent another letter to Bak indicating the Mitchells' racial background and their belief that discrimination had played a role in the deal's disintegration. Ongioni's letter stated that her clients intended to pursue legal remedies if they were not permitted to purchase the Property. On February 8,

Bak responded to Ongioni's second letter, stating that neither she nor the Shanes had been aware of the Mitchells' race prior to Ongioni's letter and reiterating that the delay and the material change to the returned contract were the true reasons for the Shanes' rejection of the Mitchells' offer. On February 12, the Mitchells' litigation counsel, Stephen Mitchell ("SM"), wrote to Ryan's manager, Satornino, and threatened to seek a preliminary injunction if the matter was not quickly resolved. Satornino responded by letter on February 13, stating that the Mitchells had been afforded an equal opportunity to purchase the Property. Bak also wrote to SM on February 13, repeating the substance of her February 8 letter to Ongioni and informing him that the Shanes would pursue available remedies if the Mitchells initiated legal action. On February 14, 2002, Bak's assistant deposited Selleck's down payment check.

The Mitchells filed a complaint in federal district court on February 20, 2002, alleging that the Shanes' rejection of their offer to purchase the Property constituted racial discrimination in violation of state and federal law. The plaintiffs contended, *inter alia*, that the defendants' failure to allow them the opportunity to counterbid against Selleck's ultimately successful offer departed from the prevailing real estate customs of eastern Long Island. They also alleged that Selleck was afforded more leeway than the Mitchells in demonstrating his financial ability to follow through on the terms of his offer. Shortly thereafter, the plaintiffs filed a Notice of Pendency to prevent the sale of the Property. On March 5, they moved for a temporary restraining order pursuant to Federal Rule of Civil Procedure 65. The court converted the plaintiffs' motion into one for a preliminary injunction, and referred the matter to Magistrate Judge Wall.

Magistrate Judge Wall conducted a three-day evidentiary hearing and issued a Report and Recommendation recommending that the district court deny the preliminary injunction. The plaintiffs filed objections to Magistrate Judge Wall's recommendation that the preliminary injunction be denied and to his decision to deny plaintiffs' request for discovery with respect to Selleck's financial wherewithal to purchase the Property. In a Memorandum and Order of April 29, 2002, Judge Platt adopted Magistrate Judge Wall's Report and Recommendation, and affirmed both the denial of the preliminary injunction and of discovery. *See Mitchell I.* We affirmed the district court on September 6, 2002. *See Mitchell v. Century 21 Rustic Realty,* 2002 WL 31006358, 45 Fed. Appx. 59 (2d Cir. Sept.6, 2002).

On October 11, 2002, the Shanes requested an Order to Show Cause why their motion for summary judgment should not be granted, and a hearing was held on October 18. The Mitchells sought and obtained further discovery, and filed papers responding to the defendants' summary judgment motions. These papers included declarations from Richard Crosier, a real estate appraiser, and Wendy Tilton, a real estate broker, concerning prevailing customs in Suffolk County real estate transactions.

In granting the defendants' motions for summary judgment, the district court found that, subsequent to our order affirming the denial of a preliminary injunction, the plaintiffs had failed to introduce any additional evidence creating a material factual dispute that would warrant a jury trial. We disagree, and hold that the plaintiffs have adduced sufficient evidence to raise questions as to (1) whether the prevailing custom of real estate brokers in eastern Long Island confers on brokers an

obligation to inform prospective purchasers of superior counterbids and allow them to improve upon their previous offers; (2) if so, whether Ryan's actions should be construed as a departure from that custom; and (3) whether, if such a departure were proven, it was based on racial grounds. Accordingly, we vacate the district court's grant of summary judgment to Ryan and his employer, Century 21. We affirm, however, the lower court's grant of summary judgment to the Shanes, in light of the utter lack of evidence that they knew of the Mitchells' racial background during the course of events that gave rise to this suit.

## II. Discussion

We review a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the nonmoving party. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 119 (2d Cir. 2003). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under this standard, a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

■ The Fair Housing Act makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Likewise, property owners and their agents may not "unlawfully discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling." *Id.* § 3604(b). We evaluate claims of housing discrimination under the *McDonnell Douglas* burden-shifting framework.[4] *See Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir.1979). Accordingly, once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action. *See Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir.2000). Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination. *Id.* at 91.

### A. Prima Facie Case

■ Plaintiffs may establish a prima facie case of housing discrimination by showing (1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers. *See Robinson*, 610 F.2d at 1038. The first and third elements—that the Mitchells are African–American, and that their offer to purchase the Property was rejected—are undisputed. However, in denying the plaintiffs' motion for a preliminary injunction, the district court suggested that the

---

4. Housing discrimination claims under New York Executive Law Section 296 are evaluated under the same framework. *See Hughes v. Lillian Goldman Family, LLC,* 153 F.Supp.2d 435, 453 n. 11 (S.D.N.Y.2001).

Mitchells had not shown that they were qualified to purchase the Property, because they did not meet the Shanes' requirement of an 80 percent mortgage contingency. *See Mitchell I*, 233 F.Supp.2d at 434 n. 16. Even assuming that the Shanes' preference for greater equity in the property was an absolute prerequisite, it is anything but clear that the Mitchells were unable to provide this level of financing. Indeed, when they heard from Ongioni that their stipulation of 90 percent financing was an obstacle to the deal, the Mitchells immediately authorized her to offer 80 percent.

The district court also found the Mitchells unqualified because they did not obtain a mortgage commitment letter until March 1, 2002. *See id.* at 434. But this hardly rendered them unqualified, since the sellers never suggested that prospective buyers needed to obtain a guarantee of financing before signing a contract to purchase the Property. When the Shanes requested proof that the Mitchells would be able to follow through on their offer, the Mitchells quickly obtained a preapproval letter from a reputable mortgage broker for 90 percent financing. Though the Shanes apparently expressed concern about this level of equity, there is no evidence that they objected to the provision of a preapproval letter rather than an actual commitment. In any event, the Mitchells' offer to the Shanes stipulated an approximate closing date of March 1, 2002, the very day on which the Mitchells received a mortgage commitment. The plaintiffs, therefore, were qualified to purchase the Property.

■ There is also some dispute about whether the plaintiffs established the fourth element of a prima facie case of housing discrimination—that the housing opportunity remained open to others after Mitchells' offer was rejected. In *Mitchell I*, the district court found that "the Prop-erty did not remain available after the Shanes decided not to sell to the Mitchells," because after the Shanes received the Mitchells' amended contract, the Shanes decided to contract with Selleck. *Id.* The *Mitchell I* court, however, may have misapprehended the fourth element. The court acknowledged that, "[a]fter the Shanes received the Mitchells' counteroffer in writing, [the Shanes] ... contracted with Selleck"; yet the court concluded that the Property "did not remain available" after the Shanes rejected the Mitchells' counteroffer. *Id.* Tellingly, the court went on to state that "while the Property may theoretically [have] remain[ed] available, it ... [did] not remain available *to the Mitchells.*" *Id.* (emphasis added). Clearly, then, the court believed its analysis of the fourth element to hinge on the Property's availability to the Mitchells after the rejection of their offer, rather than on the Property's commercial availability to others at this time. This reasoning, however, would stand the fourth element on its head. Here, no one disputes that for some time after the Property was no longer available to the Mitchells, it remained available to at least one other prospective purchaser—Selleck, a white purchaser. This speaks to the very essence of the fourth element. *See, e.g., Hughes v. Lillian Goldman Family, LLC,* 153 F.Supp.2d 435, 452 (S.D.N.Y.2001). The gravamen of the Mitchells' action is that they were treated differently from white prospective buyers in the course of negotiations, and as a result, that Selleck was able to purchase the Property and they were not. Clearly, the plaintiffs have established a prima facie case.

## B. Summary Judgment

### 1. Harvey and Sheila Shane

■ The Shanes are entitled to summary judgment on all of the plaintiffs'

claims[5] because there is no evidence that the Shanes had any knowledge of the Mitchells' racial background until after the Shanes had rejected the Mitchells' offer and signed a contract with Selleck. The Shanes resided in Florida during the whole of the negotiations concerning their Property, and never met the Mitchells. There is no reason to doubt their assertion that Ongioni's February 7 letter to Bak was the Shanes' first indication that the Mitchells were African–American. The plaintiff bears the ultimate burden of proving, by a preponderance of the evidence, that the defendants' challenged actions were motivated by discrimination; without some evidence of knowledge of the prospective buyers' racial identity, it is impossible to infer such motivation. *See, e.g., Soules v. U.S. Dep't of Hous. & Urban Dev.,* 967 F.2d 817, 822 (2d Cir.1992) (noting, as part of prima facie case, defendant's knowledge of plaintiff's familial status, the basis for the alleged housing discrimination); *Hamilton v. Svatik,* 779 F.2d 383, 387 (7th Cir.1985) (stating that defendant's awareness of plaintiff's race is necessary to established a prima facie case under the Fair Housing Act). Accordingly, no reasonable jury could find that the Shanes discriminated against the Mitchells in rejecting their offer to purchase the Property.

## 2. Matthew Ryan

■ There is no dispute that Ryan, in contrast, was well aware of the Mitchells' race, having been present at their second inspection of the Property in December 2001. There is, moreover, a genuine issue of material fact as to (1) whether there was a custom in eastern Long Island dictating that a real estate broker must disclose the existence of a competing offer to bidders involved in negotiations with the seller; and (2) if so, whether Ryan violated that custom and treated the Mitchells differently from white prospective purchasers.[6] The plaintiffs presented evidence suggesting that the prevailing custom in Suffolk County was for brokers to give competitive bidders the opportunity to make a counter-offer when a superior offer is made by another prospective buyer. Ongioni testified that in her experience, a seller would always give a bidder the opportunity to improve upon his or her offer "rather than just unilaterally returning the down payment check." Similarly, Kaplan testified that Ryan's refusal to disclose to her whether the Shanes had received another offer was contrary to the usual custom. The plaintiffs also presented declarations from Wendy Tilton, a licensed real estate broker and teacher of real estate law, and Richard Crosier, a real estate appraiser, averring the existence of such a custom in Suffolk County. Indeed, as the plaintiffs point out, a seller interested in concluding the best deal possible presumably would welcome additional, higher bids.

Ryan contends that no such custom existed, and that even if such notification were part of his obligation as the listing broker, he fulfilled that duty by informing Kaplan on or about January 17 that there

---

5. In addition to their claims under the Fair Housing Act and New York Executive Law Section 296, the plaintiffs also sued the Shanes for alleged violations of 42 U.S.C. §§ 1981 and 1982.

6. Of course, if Ryan regularly violated that custom for white purchasers as well, any violation with respect to the Mitchells would not be evidence of discrimination. The existence of a *custom*, however, is itself evidence that the practice was followed in the ordinary case. Accordingly, if the plaintiffs succeed in showing that a custom existed, it is up to Ryan to show that he, at least, honored the custom in the breach with respect to whites as well as to blacks.

might be another buyer interested in the Property.[7] We do not doubt that a reasonable factfinder could conclude that Ryan violated no custom in his dealings with the plaintiffs, or that even if he did depart from normal procedures, the totality of the circumstances—including his alleged solicitude for the plaintiffs in earlier stages of negotiation—obviates any inference of discrimination. Still, given that multiple interpretations of the evidence are possible, there are questions that must appropriately be put to a jury, and so we vacate the district court's grant of summary judgment to Ryan.

### 3. Century 21 Rustic Realty

■ The Fair Housing Act imposes liability without fault on employers in accordance with traditional agency principles. *See Meyer v. Holley,* 537 U.S. 280, 282, 285–86, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003). Thus if Ryan is found liable for discrimination, Century 21, as Ryan's employer, may also be liable. Since Century 21's potential liability is dependent upon the outcome of the Mitchells' suit against Ryan, summary judgment on their claims against Century 21 is inappropriate.

### C. Recusal

The district court denied the Mitchells' motions to recuse Magistrate Judge Wall and District Judge Platt from this case. Finding no grounds on which to justify recusal of either judge, we affirm the lower court's denial of those motions.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to defendants Sheila and Harvey Shane, its cancellation of the Notice of Pendency, and its denial of plaintiffs' motions for recusal. We VACATE the grant of summary judgment to defendants Matthew Ryan and Century 21 Rustic Realty, and REMAND for further proceedings consistent with this opinion.[8]

---

7. Defendants emphasize that, in reviewing the district court's denial of a preliminary injunction, we found that "the plaintiffs failed to establish the existence of a custom in the real estate industry of disclosing to interested buyers the specific terms of another buyer's offer prior to agreeing to a sale, or that Ryan departed from such a custom in this case." *Mitchell,* 45 Fed.Appx. at 60. We review a district court's denial of a motion for a preliminary injunction for abuse of discretion, and reverse only when the plaintiffs have shown irreparable harm and either a likelihood of success on the merits, or serious questions going to the merits and a balance of hardships tipping decidedly in favor of the moving party. *See TCPIP Holding Co. v. Haar Communications, Inc.,* 244 F.3d 88, 92 (2d Cir.2001). The bar for surviving a motion for summary judgment is not nearly so high.

Therefore, even if the plaintiffs had adduced no additional evidence in the interim, we still might find that genuine issues of material fact existed, precluding summary judgment. In any event, in this case, the plaintiffs *have* supplemented the preliminary hearing testimony with declarations from individuals familiar with local real estate practices as to the existence of the asserted custom.

8. In the interest of judicial economy, we note that nothing presented to us suggests that the standard for the imposition of sanctions or attorneys' fees in cases of this sort has been met. *See Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *LeBlanc–Sternberg v. Fletcher,* 143 F.3d 765 (2d Cir.1998).