**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAMELA MCDONALD; KANYA
COLEMAN,
       *Plaintiffs-Appellants,*

v.

COLDWELL BANKER, Coldwell
Banker Real Estate Corporation
FIRST SHASTA REALTY; THOMAS
GALLAGHER; RICHARD MATTIOLI,
       *Defendants-Appellees.*

No. 06-16563

D.C. No.
CV-03-03598-JL

OPINION

Appeal from the United States District Court
for the Northern District of California
James Larson, Magistrate Judge, Presiding

Argued and Submitted
May 15, 2008—San Francisco, California

Filed September 10, 2008

Before: Diarmuid F. O'Scannlain and
Michael Daly Hawkins, Circuit Judges, and James V. Selna,*
District Judge.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by Judge Hawkins

---

*The Honorable James V. Selna, United States District Judge for the
Central District of California, sitting by designation.

**COUNSEL**

Steven J. Mehlman, Mehlman & TerBeek LLP, Walnut Creek, California, argued the cause for the plaintiffs-appellants and filed briefs; Marc L. Terbeek, and Timothy A. Walker, Mehlman & TerBeek LLP, Walnut Creek, California, were on the briefs.

Malcom Sher, Sher & Minnard LLP, Walnut Creek, California, and John A. Schwimmer, Sussman Shank LLP, Portland, Oregon, argued the cause for the defendants-appellees and filed briefs; Carla V. Minnard, Sher & Minnard LLP, Walnut Creek, Califoria, was on the First Shasta, Gallagher & Mattioli brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether a potential home buyer has established a prima facie claim for discrimination against the sell-

er's listing agents, under various federal and state statutes, for a rejected offer where she and they were of different races.

I

Pamela McDonald, an African-American, sought to buy a house in the Shasta-Redding, California area for herself and her children in 2002. Her real estate agent Kanya Coleman, also an African-American, contacted First Shasta Real Estate ("First Shasta"), a franchisee of Coldwell Banker Real Estate ("Coldwell"), and spoke with First Shasta agent Tom Gallagher, a Caucasian, over the phone. They planned to meet to view homes for sale. Prior to the meeting with Gallagher, Coleman prepared a pre-approval letter on her stationery confirming that McDonald qualified for a real estate loan of up to $180,000. The approval was "subject to an acceptable appraisal at or above the purchase price . . . ." McDonald's monthly income was approximately $3,000 and she had cash on hand in the amount of $20,000.

On August 2, 2002, Coleman and McDonald met with Gallagher for the first time. According to both Coleman and McDonald, Gallagher did not express the same enthusiasm he had when speaking to Coleman on the phone. Gallagher showed McDonald a number of listings, including the 2075 Galaxy Way property at issue in this case. After viewing that house, Coleman and McDonald claim that Gallagher offered to show them additional properties that he believed might be more "suitable" for McDonald and her family, but the properties were "less upscale." However, it is undisputed that Coleman, alone, picked out the houses McDonald looked at.

McDonald particularly liked the Galaxy Way property, which had been listed for sale at $139,000 for over six weeks and Coleman drew up an offer. Coleman told Gallagher and his broker, Richard Mattioli, also Caucasian, that her client needed to finance one hundred percent of the purchase price, but in return she was willing to offer more money than the

seller was asking. McDonald tendered a $1,000 good faith deposit.

While Coleman was drafting the offer McDonald claims that Gallagher, noting her use of a walking cane, inquired about how she "became disabled" and the demographics of where she lived.

McDonald's initial offer on the property was for a purchase price of $153,890, of which $138,501 would be paid directly to Moore (funded by a pre-approved loan and a $1,000 deposit by McDonald) and $15,389 would be carried by Moore (secured by a second deed of trust). The offer provided that McDonald would receive a $4,500 credit at closing. Gallagher and Mattioli experienced doubts about the proposal. They had not done seller carrybacks for years and felt it was not necessary in their market.[1] They decided to talk it over with the seller's agent, David Woodfill, a Caucasian, to see if he thought the offer was worth presenting to his client, Glenn Moore, a Caucasian, the owner and seller of the Galaxy Way property. Woodfill said Moore wanted all cash and was not interested in "carrying paper." Both Woodfill and Moore were also concerned that the McDonald offer would not close escrow because the property would not appraise for more than ten percent above the listing price. Woodfill told Gallagher and Mattioli that the McDonald offer would be unacceptable to Moore, so they did not present it to Woodfill or Moore in written form. In any event, Coleman faxed the offer to Woodfill without modification, despite having been told that Moore would not accept the carryback provision. A few days later, Moore accepted another offer, with no carryback and no refund of closing costs, at slightly less than the asking price. The ultimate buyer, John Randall Donoghue, was Caucasian.

---

[1]Contrary to the assertions of the dissent, there is no evidence in the record to support its contention that a seller carryback is a "condition common to residential real estate transactions," especially with respect to the real estate market at issue here. Dissent at 12665.

McDonald filed a complaint against Gallagher, Mattioli, Shasta and Coldwell Banker (collectively "listing agents"), but not against Woodfill or Moore himself, with the California Department of Fair Employment and Housing ("DFEH"), which found no evidence of discrimination. Its letter of July 2004 stated:

"Based on the evidence obtained during the investigation, the DFEH has determined that reasonable cause does not exist to believe that a discriminatory housing practice has occurred."

The U.S. Department of Housing and Urban Development ("HUD") through its Office of Fair Housing and Equal Opportunity, adopted the decision of the DFEH and notified McDonald that under the provisions of the federal Fair Housing Act, she had two years after the occurrence or termination of the alleged discriminatory housing practice to file suit in federal court. This time limit was tolled during HUD's investigation.

McDonald filed her federal lawsuit against the listing agents for housing discrimination on the basis of race and disability.[2] She asserted claims under California's Fair Employment and Housing Act ("FEHA"), California's Unruh Act ("Unruh Act"), and the federal Fair Housing Act ("FHA"). Coleman, as McDonald's real estate agent, sued the listing agents under California Business and Professions Code § 17200, for the commission she lost as a result of the lost sale of the property.

The district court granted summary judgment in favor of the listing agents on all the claims.

---

[2]In her claims before the DFEH and HUD she also alleged discrimination on the basis of marital and familial status, but dropped those claims in her federal lawsuit.

## II

## A

**[1]** A *prima facie* case is established under the FEHA where the plaintiff shows that she is a member of a protected class, that she applied and was qualified for a housing accommodation, was denied such housing accommodation, and that similarly situated individuals not in a protected class applied for and obtained housing, or if "[she] provide[s] other circumstantial evidence of discriminatory motive in refusing her the housing accommodation." *Dep't of Fair Employment and Hous. v. Superior Court,* 99 Cal. App. 4th 896, 902 (Ct. App. 2002) (citing *Gamble v. City of Escondido*, 104 F.3d 300, 304-05 (9th Cir. 1997)). A "qualified" purchaser is one who meets the terms of the seller. *See Mitchell v. Shane*, 350 F.3d 39, 47-48 (2d Cir. 2003).

In *Mitchell*, the potential buyer made an offer that required 90 percent financing, which the seller rejected, expressing a desire to have at most 80 percent financing. *Id.* at 48. In response, the potential buyer dropped the financing to 80 percent. Therefore, because the potential buyer met the terms of the seller, the buyer was "qualified." *Id.*

**[2]** Here, the undisputed fact is that the seller refused to engage in a seller carryback provision. Indeed, the basis of this refusal was communicated to Coleman, who nevertheless transmitted the offer in writing, unchanged, to the seller's agent, Woodfill. Because neither Coleman nor McDonald attempted to meet the terms of the seller, they cannot be considered "qualified" for purposes of establishing a *prima facie* case. Moreover, because the McDonald offer included a seller carryback provision notwithstanding a purchase price ten percent above the list price, she cannot say that she was "similarly situated" to the person who eventually purchased the house for just under the list price amount. In other words, Coleman and McDonald have not produced any evidence to

create a genuine issue of material fact regarding whether or not they met the terms of the seller or whether the terms were similar to those met by the ultimate buyer.[3]

Despite not being similarly situated to the ultimate buyer, McDonald could also try to establish that there is "circumstantial evidence of discriminatory motive in refusing her the housing accommodation." *Dep't of Fair Employment and Hous.*, 99 Cal. App. 4th at 902. A discriminatory motive under the FEHA has been defined as something that "moves the will and induces action." *Caldwell v. Paramount Unified Sch. Dist.*, 41 Cal. App. 4th 189, 199 (Ct. App. 1995).

[3] However, despite allegations of awkwardness or lack of enthusiasm, neither Coleman nor McDonald has produced any evidence that Gallagher or Mattioli disparaged Coleman or McDonald on account of their race or that Gallagher or Mattioli treated only African-American or disabled individuals the way they treated McDonald. Most significantly, there has been no evidence presented by either Coleman or McDonald that the ultimate buyer in this case was aided by or was a customer of Gallagher or Mattioli. In other words, there is no evidence that any of the listing agents acted with the intent to

---

[3]The dissent attempts to create doubt about whether or not the seller or the seller's agent understood that the offer was for $153,890. Dissent at 12665-66. However, there is no doubt that the offer was understood at the time it was made. Indeed, the size of the McDonald offer is one of the reasons that her's and Donoghue's offers cannot be considered similarly situated. McDonald's loan was contingent on her purchasing the house for the fair market value or less; Woodfill, and Moore, were concerned that her offer was too large and would not close escrow because the property would not appraise for more than her offer. Curiously, the dissent does not give any meaningful discussion of either McDonald's mortgage loan pre-approval or the prospects of closing escrow, elements of great importance when determining whether dueling offers with respect to a real estate transaction are similarly situated.

secure the purchase of the house by a person who is of a different race than McDonald.[4]

[4] Because Coleman and McDonald have failed to produce any evidence establishing that McDonald was "qualified," "similarly situated" or that Gallagher or Mattioli had a "discriminatory motive"[5] they cannot establish a *prima facie* case under FEHA based on either race or disability.[6]

---

[4]The fact that the ultimate buyer and McDonald are of different races is not enough to establish a *prima facie* case of discrimination where there is no evidence that both of them are clients of the same listing agents. Without discriminatory, or at the very least, different treatment of two buyers by the listing agents there can be no foundation for a claim of discrimination. *See Dep't of Fair Employment & Hous.,* 99 Cal. App. 4th at 902. The dissent's contrary position, without any citation to legal precedent, would create a *prima facie* case of discrimination whenever the parties to the litigation are of a different race. Dissent at 12670.

[5]The Unruh Civil Rights Act is codified at California Civil Code § 51 and provides that "no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation [all persons] are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). Since there is no evidence of discrimination against McDonald, her Unruh Act claims fail. Because Coleman's Unruh Act claim rests on McDonald's Unruh Act discrimination claim, the lack of any evidence of discrimination is fatal to that claim as well. *See Jackson v. Superior Court*, 30 Cal. App. 4th 936, 941(1994) (holding that an African-American investment advisor who accompanied two clients into a bank could assert a § 51 claim alleging discrimination against the bank based on discrimination directed at his client, even though the advisor was not an actual customer of the bank).

[6]It should be noted that McDonald, who asserts disability by virtue of her use of a walking cane, has not produced any evidence of being disabled within the meaning of the Unruh Act, which requires any "physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does *both* of the following: (A) [a]ffects one or more of the following body systems: neurological, immunological, musculoskeletal, . . . and (B) [l]imits a *major life activity*." *See* Cal. Gov. Code § 12926 (k)(1)(A)-(B) (emphasis added). The only evidence of disability presented by McDonald is that she uses a cane; this, alone, does not establish that a "major life activity" has been limited. *See* 42 U.S.C. § 12102; *see also Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 564-66 (1999) (holding that to be "disabled" under the Americans with Disability Act ("ADA") one must have "limitations that are in fact substantial" and because every determination of whether an individual is disabled is "case-by-case," particularized evidence is needed).

B

With respect to the FHA claim, the standard of proof and analysis applied in a disparate treatment case are the same as those applied in a FEHA case.[7] *See Gamble*, 104 F.3d at 305. The plaintiff must first establish a prima facie case by showing: (1) she is a member of a protected class; (2) she applied for a house and was qualified to buy it; (3) the home sale was denied despite her being qualified; and (4) defendant approved a home sale for a similarly situated party during a period relatively near the time plaintiff was denied the house. *Id.*

[5] For the reasons discussed in the FEHA claim analysis (1) McDonald was not a qualified buyer within the meaning of the FHA; and (2) McDonald was not similarly situated to the party who purchased the home. Thus, McDonald failed to establish a *prima facie* FHA claim.

C

Coleman's unfair competition claim is based on California Business and Professions Code § 17200, which states that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice . . . ." Cal. Bus. & Prof. Code § 17200. Because neither Coleman nor McDon-

---

[7]Under FHA, a party can bring either a disparate impact or a disparate treatment cause of action. *Gamble*, 104 F.3d at 304-05. Disparate treatment requires some showing of discriminatory intent on the part of the defendants, whereas to support a disparate impact claim a plaintiff must establish " '(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.' " *Id.* at 306 (quoting *Pfaff v. United States Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996)). Here, neither Colman nor McDonald have produced any evidence indicating that the facially neutral actions of the defendants have produced a disproportionate impact on African-American or disabled individuals.

ald has produced any evidence of fraud or illegal activity, in order to prevail, Coleman must establish that Gallagher and Mattioli acted unfairly towards her or McDonald.

**[6]** An unfair business practice is one that either "offends an established public policy" or is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App. 3d 509, 530 (Ct. App. 1984), *abrogated on other grounds Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 & n.12 (1999).

**[7]** Coleman mainly rests her § 17200 claim on alleged discrimination by Gallagher and Mattioli; however, as mentioned above, there is no evidence which would allow a reasonable jury to return a verdict in her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Futhermore, despite Coleman and McDonald's characterization of the listing agents' actions, they offer no factual evidence upon which a reasonable jury could return a verdict for them finding that a failure physically to convey McDonald's offer was "immoral, unethical, oppressive or unscrupulous." *Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App. 3d at 530.

D

Finally, we turn to the question of whether Coldwell Banker can be held liable under a principal/agent theory.

**[8]** Generally, a finding of vicarious liability is determined by traditional common law principles. *Meyer v. Holley*, 537 U.S. 280, 282 (2003). Because there is no evidence of illegal conduct on the part of Gallagher, Mattioli or First Shasta, there is no conduct for which Coldwell could be held vicariously liable.

III

The district court's grant of summary judgment in favor of the listing agents on all claims is

**AFFIRMED.**

---

HAWKINS, Circuit Judge, concurring in part, and dissenting in part:

Pamela McDonald ("McDonald"), an African-American woman seeking to relocate to a predominately white community in another city, asks Kanya Coleman ("Coleman"), her African-American real estate agent, to present an offer on a residential property for sale in that community. Coleman testified, and defendants do not suggest otherwise, that McDonald was pre-approved for $180,000 financing. Indeed, McDonald had a steady income of $3,000 per month, in addition to $20,000 in additional funds on hand. Working through a real estate agency in the community where the property is located, they present an offer. The offer is above the asking price, but contains a condition common to residential real estate transactions: that the bulk of the purchase price be funded with a pre-approved mortgage and the remainder with a comparatively small carry-back loan from the seller to the buyer.

The seller, apparently thinking that the carry-back condition requires him to pay the buyer money, declines the offer. The local agents never explain to the seller or his agent that the carry-back is in fact additional money to be paid to him over time, with market rate interest and secured by the property itself. Instead, without ever consulting McDonald or Coleman, they withdraw the offer. Later, the property is sold to a non-minority buyer for a price less than the McDonald offer—in fact, less than that offer even excluding the carry-back. When the terms of the McDonald offer are presented to the seller at his deposition, he finds it acceptable and reasonable and testified he would have followed up on it. When Coleman described the offer to the seller's agent, he was puzzled why the fully-explained offer—which he considers a

"good one"—was not submitted to the seller for his consideration.

The majority looks at these facts and concludes it was appropriate to award the local agents summary judgment on the grounds that McDonald was not a "qualified buyer" because she refused to "meet the seller's terms." While my reading of the record is quite different with respect to such matters as the actual terms of McDonald's offer, the seller's terms, and McDonald's efforts to adjust her offer, these are fact intensive questions that are wholly inappropriate for resolution on summary judgment. McDonald is entitled to a jury trial to determine whether the actions of the local agents were the result of discriminatory motives or mere bumbling miscommunication.

In reviewing a summary judgment grant, our task is to "view the evidence . . . in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party," *Bank of New York v. Fremont General Corp.*, 523 F.3d 902, 909 (9th Cir. 2008), and then decide whether a "genuine issue as to any material fact" precludes summary judgment. *Porter v. California Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir.2005). Contrary to this duty, the majority has drawn numerous inferences in favor of the defendants, and has recast disputed material facts as "undisputed."

The majority first fails to recognize that McDonald's offer is at least equivalent to the ultimate purchase price. In fact, her offer amounted to at least $138,501 *up-front*, minus only the closing costs.[1] Donoghue, the ultimate buyer, prepared an

---

[1]The total of $138,501 is the amount reflected in McDonald's written offer, which is in the record. The closing costs associated with the McDonald offer amounted to $4,500 (to be forwarded by the seller); it is unclear what the total closing costs were for the Donoghue transaction. Although it is true, as the majority states, that the Donoghue offer did not include a "refund of closing costs," the Donoghue offer required the seller

initial offer of $134,000, minus 50% of the closing costs. Donoghue ultimately purchased the property for $138,000 (again, minus the seller's 50% share of the closing costs). However one slices it, McDonald's offer surpassed Donoghue's first offer and was at least equivalent to the ultimate selling price. The alleged defect in the McDonald offer is that the offer included an additional amount *over* the $138,501: a "carryback" of $15,389, which McDonald proposed would be carried by the seller and secured by a second deed of trust.[2] But even if we assume that the seller was completely unwilling to do any financing, McDonald's offer was *still* equivalent to the ultimate selling price.

After ignoring the actual terms of the McDonald offer, the majority states that the seller "refused to engage in a seller carryback provision" and that "neither Coleman nor McDonald attempted to meet the terms of the seller." By my reading, these statements are flatly contradicted by the record.

In concluding that the seller "refused to engage in a seller carryback provision," the majority contradicts the seller's own testimony. In fact, the seller's "refusal" to accept a carryback was based on his misunderstanding of what was on the table. The seller apparently believed that the $15,389 carryback was to be *deducted* from the $138,501 rather than added to it, and he was not interested in doing that:

---

to *pay* half the closing costs, while the McDonald offer contemplated that the seller would finance the closing costs but would be repaid pursuant to the carryback provision. At any rate, no one is arguing that whatever slight discrepancy there may have been between the closing costs rendered McDonald unqualified.

[2] Although there was some question as to whether the property would appraise for $153,890, this is a disputed question of fact. At any rate, the property apparently appraised for $138,000, since this is the amount at which the property was sold, and McDonald offered that amount up front.

> My understanding was, that we got a full asking price, and $15,000 had to be carried back out of that amount. I was not told 153 and 15 out of that; so I don't know what that's going to do to the case, but that — I mean I'm not stupid. If I get my money, plus 15,000 in payments . . . I remember full price, 15 carry back. That's all he said, and I said no. I can't afford to take 15 back.

In response to a deposition question describing the essentials of the McDonald offer,[3] the seller testified that he would have considered such an offer both reasonable and acceptable, and would have wanted to follow up on it. Coleman stated that when she called the seller's agent and described the McDonald offer, he was puzzled why such a good offer was not submitted to the seller.

Viewing this evidence, as we must, in the light most favorable to McDonald and Coleman, the seller did not "refuse[ ] to engage in a seller carryback provision," but rather was simply confused as to its meaning. The evidence suggests that, had the seller understood that the "carryback" was $15,389 above and beyond the $138,501 cash portion of the offer, he would have considered the offer.

Even if the seller did have some aversion to receiving an additional $15,389 through a carryback, there is no evidence that Coleman and McDonald failed to "attempt[ ] to meet" such a term. In fact, Coleman testified that she tried to speak to local agent Mattioli about submitting a revised offer but he became "hostile."[4]

---

[3]The hypothetical offer was described as $137,501 up-front plus a secured note for an additional $15,389 (at 10% interest), with $4,500 credited back to non-recurring closing costs. This appears to be exactly the McDonald-Coleman offer, only absent the additional $1,000 deposit.

[4]Mattioli himself admitted to hanging up on Coleman.

In addition, Woodfill, the seller's agent, testified that he doesn't recall local agent Gallagher going over the terms of McDonald's offer with him, but received a call from First Shasta (Gallagher's and Mattioli's office) that the offer had been *withdrawn*. Coleman in fact later submitted a written copy of the offer to Woodfill, but this was after Woodfill was told that the offer had been withdrawn. Woodfill testified that it would not have been his policy to resurrect an offer that was being withdrawn.

There is no evidence in the record that either McDonald or Coleman ever authorized defendants to withdraw the offer or that defendants ever advised McDonald or Coleman to make a revised offer. Nor is there anything in the record to suggest McDonald would have been unwilling to remove the carry-back portion of her offer—there is no reason that she would insist on taking out a $15,389 loan from the seller if she were aware that the seller would be content to accept only the $138,000 up front. There is no indication that McDonald was unwilling to meet the seller's terms. Again, McDonald's offer was almost identical to the offer that was accepted—differing only in the *additional* $15,389 McDonald offered to pay by way of carryback.

In spite of this record, the majority manages to conclude that "Coleman and McDonald have not produced any evidence to create a genuine issue of material fact regarding whether or not they met the terms of the seller or that they were similarly situated to the ultimate buyer." Summary judgment review does not permit us to pick and choose facts. The facts of record are clear: McDonald produced a wealth of evidence, including McDonald's written offer, Donoghue's first and second offers, Coleman's testimony, Woodfill's testimony, and the seller's testimony—all of which tend to show that McDonald was both willing and able to make an acceptable offer.

Having produced that evidence, plaintiffs established a prima facie case, since it is undisputed that Coleman and McDonald are members of a protected class and Donoghue, the ultimate buyer, is not. All that is necessary at this stage of the litigation is that McDonald demonstrate that she is a qualified buyer who was treated differently from a non-minority buyer. This she has done.[5] Because plaintiffs established a prima facie case under FEHA, their unfair competition claim also survives summary judgment, since California Business and Professions Code § 17200 prohibits "unlawful" business acts and practices.[6]

Today the majority holds that the evidence McDonald and Coleman produced is insufficient as a matter of law to establish a prima facie case under FEHA. The unfortunate result is that a minority buyer who produces both documentary evidence and record testimony that her offer was equivalent to a non-minority buyer's offer can still be denied access to the trier of fact. If this evidence is insufficient, it is difficult to see what would be sufficient, short of a defendant's under-oath admission that the plaintiff was qualified and was nevertheless purposefully discriminated against. No defendant will ever make such an admission — which is precisely why the prima facie burden-shifting framework exists. The troubling and hard to explain result here is certain to leave many minority buyers without a remedy.

---

[5]The summary judgment grant could, of course, also be upheld if defendants presented a "legitimate reason" for the discrepancy, but the "legitimate reason" proffered is only that the seller was unwilling to engage in any carryback, which (as discussed) Coleman and McDonald have sufficiently disputed.

[6]Because I agree that plaintiffs have failed to show that First Shasta is either an agent or ostensible agent of Coldwell Banker, I would affirm as to the summary judgment grant in favor of Coldwell Banker.