WILLIAM F. KUNTZ, II, United States District Judge:
Cindy Sanchez and Sara Oyola, as represented by the 273 Lee Avenue Tenants Association (the "Tenants Association") (collectively, "Plaintiffs")[1] -raise federal and state claims of housing discrimination against the landlord, Naftali Steinmetz, and his associated legal entity, 273 Lee Realty, LLC (together, "Defendants"). Defendants now move under Rule 56 of the Federal Rules of Civil Procedure for summary judgment on all claims based on (1) res judicata and collateral estoppel, (2) statute of limitations, (3) failure to state a claim, and (4) no genuine disputes as to any material facts. For the reasons that follow, Defendants' motion is GRANTED in part and DENIED in part.
BACKGROUND AND PROCEDURAL HISTORY
The following facts, drawn from the parties' Local Rule 56.1 Statements, declarations, deposition testimony and other evidence submitted in support of the motion, are undisputed or described in the light most favorable to Plaintiffs, the non-moving party.[2] See Fed. R. Civ. P. 56(c) ; Capobianco v. City of New York , 422 F.3d 47, 50 n.1 (2d Cir. 2005).
I. Factual Background
Plaintiffs Cindy Sanchez and Sara Oyola are or were long-time residents of rent-stabilized apartments at 273 Lee Avenue in the South Williamsburg neighborhood of Brooklyn, New York (the "Building"). Pls.' Rule 56.1 Statement ("Pls.' Facts") ¶ 1, ECF No. 99-1. Oyola occupied apartment 1L; Sanchez occupies apartment 3L; and former plaintiff Kathleen Santiago occupied apartment 1R. Id. ¶ 28. The Tenants Association is an unincorporated association *783 purportedly comprised of Sanchez, Oyola, Santiago, and their families. Defs.' Rule 56.1. Statement of Undisputed Facts ("Defs.' Facts") ¶ 2, ECF No. 96-2. The Tenants Association was founded in 1998 by a group of the Building's Latino tenants with the goal of "establish[ing] ... a functioning landlord-tenant relationship [and] ... ensuring the habitability and proper maintenance of their building and their homes." Compl. ¶ 20, ECF No. L Beginning in or about 2001, Latino members of the Tenants Association began to move out of the Building, either of their own volition or after accepting buy-outs "after years of not getting repairs made to their apartment[s]." Id. ¶¶ 23-40. After each family moved out, the landlords renovated their apartments, each of which the landlords had allowed to fall into a state of disrepair, and new Hasidic Jewish tenants moved into the apartments. Id. Following Oyola's eviction in October 2017, Sanchez is the only remaining Latino tenant in the Building; all of the rest of the tenants are believed to be Hasidic. See id. ¶¶ 41-46.
Defendant 273 Lee Realty, an LLC of which defendant Steinmetz is the sole member, purchased the Building in or about early 2006, at which time Defendants inherited a history of rancor and conflict between the Plaintiffs, who identify as Latino, and their former landlords, who are alleged to have been Hasidic. Defs.' Facts ¶¶ 3-4; Pls.' Facts ¶ 6; Compl. ¶¶ 2-6. 273 Lee Realty transferred the Building to Steinmetz in December 2010, and Steinmetz is the current owner of the Building, Defs.' Facts ¶ 5. Plaintiffs allege when Steinmetz-who is also alleged to be Hasidic-took over ownership of the building in 2006, he sought to continue a trend that had already been playing out in the Building, and South Williamsburg more broadly, for several years: the marginalization of and active discrimination against Latino residents in favor of other Hasidic Jewish residents. Compl. ¶¶ 3-10. Specifically, Plaintiffs allege they have "experienced discrimination at the hands of Defendants and Defendants' agents" particularly by being "treated differently from, and in an inferior manner to, their Hasidic Jewish neighbors." Id. ¶ 10.
Plaintiffs allege they have "experienced severe harassment and discrimination at the hands of the various Hasidic Jewish landlords to own the Premises since 1996," including Defendants, and, as a result of Defendants' discrimination against them, Plaintiffs "have not only lived with various conditions of disrepair and a lack of services, despite their requests for assistance, but they have also suffered the indignity of watching Defendants perform preferential repairs for, and provide superior services to, their Hasidic Jewish neighbors." Compl. ¶¶ 47-48. Plaintiffs allege Defendants have hired at least seven different management companies since 2010, which often left Plaintiffs without a point of contact to request repairs, either due to a gap between companies where there was no responsible party or because tenants were not notified of the changes. Id. ¶¶ 49-52. However, under all management companies hired by Defendants, except for one, both the contact persons and workers provided to Plaintiffs differed from those provided to the building's Hasidic Jewish residents. Id. ¶ 52.
This alleged discrimination, described in further detail infra , culminated in a trial in the Kings County Civil Court (hereinafter, the "Housing Court") to recover possession of the units occupied by plaintiff Oyola and former plaintiff Santiago (together, "the Respondents"), which Steinmetz contends was motivated by his desire to have his daughters move into the apartments. Defs.' Facts ¶¶ 8-9. The parties dispute whether Steinmetz was aware Plaintiffs were not Hasidic prior to the trial in 2016 when the parties saw each other for the *784 first time, although the record suggests Steinmetz may have known. See id. ¶ 6; Pls.' Facts ¶ 6.
A. Housing Conditions Experienced by Plaintiffs
Plaintiffs identify a number of conditions they contend are the result of purposeful discrimination against them, as Latino tenants:
1. In or about and between 2009 to 2011, Plaintiffs interacted primarily with an unidentified male worker, who informed Plaintiff Oyola he had been told to perform "poor repairs" and who would "often make things worse or refuse to make the requested repairs." Compl. ¶¶ 53-54. This worker's actions included refusing to fix a cabinet because it was not literally falling off the wall and "fiddling" with a light that needed to be fixed by an electrician, causing the entire apartment to black out, and then never calling the needed electrician. Id. ¶ 54. During the same period, an apartment of the building was being gut renovated, and was subsequently leased to Hasidic tenants. Id. ¶ 55. In 2011, the same worker cut the water lines to Plaintiffs' washing machines and directed Plaintiffs to remove their washing machines from their units, even though the renovated apartments appear to have washing machines operating in them. Id. ¶¶ 56-57.
2. When a new company was hired to manage the Building in 2011, Plaintiffs rarely received requested repairs, whereas they often observed workers performing maintenance for their Hasidic neighbors. Id. ¶ 58. When Plaintiffs did receive repairs, they were "piecemeal and substandard," such as placing sticky tiles over water damaged floors. Id. ¶ 59. During the same period, Plaintiffs observed high quality building materials and new appliances being brought into the Building for the renovation of the other apartments. Id. ¶¶ 60-61. When given the opportunity to visit one of the newly renovated apartments, Plaintiffs observed a stark contrast between these apartments and their own, which had outdated fixtures. Id. ¶¶ 62-63. A worker for this company apologized to Plaintiffs Oyola and Sanchez about the state of their apartments, but explained he had been directed not to make quality repairs in these apartments. Id. ¶¶ 64-65. This company was terminated in 2014, after which Plaintiffs were left without a point of contact for a several months, during which time they suffered from inadequate heating in their apartments. Id. ¶¶ 66-67.
3. Since 2009, Plaintiffs have often had to live without adequate heating during winter months. Id. ¶¶ 69-77. In 2009, the thermostat from the building was moved into the apartment of a Hasidic tenant, who would turn off the heat when the tenant's family left the Building for the weekend. Id. ¶¶ 70-73. The thermostat was then moved to the apartment of another Hasidic neighbor in 2010, but the heating problems persisted. Id. ¶¶ 73-74. When the maintenance company was terminated in 2014, Plaintiffs were left without a point of contact, and had to call 311 regarding; their heating issues. Id. ¶ 74, The heating issues persisted until early 2015, when a new management company took over. Id. ¶ 75. The thermostat was then moved to a shared hallway, but covered and locked in a plastic box; Plaintiffs were not given access to the thermostat *785 until November 2015, but even then were not taught how to use it or given permission to do so. Id. ¶¶ 76-77.
4. In May 2015, a leak was reported in the apartment of one of Plaintiffs' Hasidic neighbors-apartment 2L-and Defendants' agents immediately took action to repair it, even though plaintiff Oyola-who lived in apartment 1L-had been experiencing and complaining of the same leak for over a year. Id. ¶¶ 79-80. A plumber was sent to inspect plaintiff Sanchez's bathroom-in apartment 3L-and determined the leak was not in her apartment. Id. ¶¶ 81-82. The plumber then found a broken pipe in the bathroom of apartment 2L, and broke down the bathroom wall to fix it. Id. ¶¶ 82-83. The plumber also broke down the wall of plaintiff Oyola's bathroom, and left the walls unrepaired, covered only by a plastic sheet, for three months. Id. ¶¶ 84-85. When the wall was later repaired, workers "only used plastic panels." Id. ¶ 86. Around this same time, a light fixture in plaintiff Oyola's apartment began leaking, but this remained unrepaired until apartment 2L was renovated in January 2016. Id. ¶¶ 87-88. Further, in January 2016, plaintiff Oyola's bathroom sink overflowed and the condition was allowed to persist for so long that the apartment's floors and bathroom door became warped and damaged, Id. ¶¶ 89-96. Plaintiffs eventually initiated a proceeding in Housing Court to get the condition repaired, and, even then, the repairs were done in a shoddy manner. Id. ¶¶ 94-96.
5. Plaintiffs also allege they have "experienced countless problems with their building's main entrance doors and the doors of their respective apartments." Id. ¶ 97. Specifically, the doors of Plaintiffs Oyola's and Sanchez's apartments have key locks that are faulty and which take a great deal of time to open and/or doors that do not close properly, but which Defendants have failed to repair in a timely manner. Id. ¶¶ 99-101. On the other hand, Plaintiffs' Hasidic neighbors have combination locks on their doors, id. ¶ 98, and receive repairs to those locks immediately upon request, id. ¶ 101. Plaintiffs have also experienced issues being locked in and out of the Building due to difficulties with the combination lock placed on the front door and, when their counsel contacted the management company, were accused of having broken the lock and "making trouble." Id. ¶¶ 104-106.
Plaintiffs' apartments were plagued by recurring conditions of disrepair. Pls.' Facts ¶ 31. Plaintiffs contend they languished for extended periods of time without repairs and, when repairs were made, they received inferior repairs. Id. ¶¶ 15, 24(a). Defendants state Plaintiffs often denied or postponed access to perform repairs or failed to inform Defendants of necessary repairs. Defs.' Facts ¶ 26(q). City records reveal, as of September 11, 2017, there are thirty open violation records for the Building, all of which conditions are in apartments 1L, 1R, and 3L-the apartments occupied by Plaintiffs and former plaintiff Santiago. See Louis Decl. Ex. 60, Open Violation Summary Report, ECF No. 100-60. During the period Defendants owned the Building, from 2006 through September 11, 2017, there were a total of 700 closed housing code violations, with a majority of violations for units occupied by Hispanic tenants, including Plaintiffs. See Pls.' Facts ¶ 31; Louis Decl. Ex.
*786 61, Closed Violation Summary Report at 106, ECF No. 100-61.
The parties disagree as to whether Plaintiffs ever applied for or asked Defendants if they could rent any vacant units in the Building at the same rent being offered to prospective tenants. See Pls.' Facts ¶ 19. However, Sanchez explicitly denied applying for any of the vacant units; and Oyola testified she had inquired with Diego Lozano, purportedly an agent of Steinmetz, in 2011 or 2012, regarding the availability of vacant apartments. Id. Oyola was reportedly told there were no available apartments. Id. Steinmetz testified units were typically rented through word of mouth to friends or relatives of friends. Id. at ¶ 23. Further, rental applications required potential tenants to indicate the synagogue affiliation for themselves and their parents. Id. Vacant apartments were ultimately rented, but exclusively to Hasidic residents. Id. at ¶ 32.
B. Housing Court Proceedings
Unsurprisingly, the aforementioned difficulties between Plaintiffs and Defendants have resulted in a great deal of litigation between the parties, which has included at least fifteen cases litigated in Housing Court, along with the instant suit. See Compl ¶¶ 107-17. Of particular relevance to the instant action, in January 2011, Steinmetz served required notices on Respondents informing them of his intent to initiate owner's use holdover (i.e. , eviction) proceedings against them in Housing Court pursuant to Section 2524.4 of the Rent Stabilization Code, a provision that allows an owner to recover possession of a rent-stabilized apartment where the owner intends to use it as a primary residence for himself or a member of his immediate family. Id. ¶¶ 118-21. In or around March 2011, Steinmetz instigated legal proceedings in Housing Court consistent with the notices. Id. ¶ 124. Defendants assert the Housing Court proceedings were instituted to obtain possession of the apartments for two of Steinmetz's daughters and their families. Defs.' Facts ¶ 9. After five years of extensive negotiations, discovery, and motion practice, a trial commenced on June 23, 2016. Id. ¶ 10.
In the course of discovery, Plaintiffs learned Steinmetz owns interests in several other buildings, but none of his children or other relatives live in those buildings. Compl. ¶¶ 134-35. During the trial, Steinmetz testified he owns several buildings and had not thought to move his daughters into those buildings. Id. ¶¶ 136, 140. Steinmetz's daughters also testified that they had both recently moved into new apartments. Id. ¶¶ 137-39. During the pendency of this Housing Court proceeding, several apartments in the Building became available, none of which were offered to the Plaintiffs. Id. ¶¶ 142-50.
C. Housing Court Decisions
On March 23, 2017, the Housing Court issued a decision denying the Respondents' motion for a stay of the Housing Court proceedings during the pendency of the instant federal action. Carponter Decl., Ex. E ("Decision Denying Stay"), ECF No. 98-1. The Housing Court stated, "Respondents were afforded every opportunity to prove to the court that [Defendants'] intent to terminate their tenancy was discriminatory, rather than a good faith intention to provide homes for his daughters and their families." Id. at 4. Plaintiff Oyola disputes having "every opportunity" to litigate her discrimination claim, given the "severe limitations of the forum" and the "limited discovery" on the issue of intent. Pls.' Facts ¶ 12.
On March 24, 2017, the Housing Court issued a decision in the combined owner's use holdover proceedings against Respondents, ruling in Steinmetz's favor, Steinmetz Decl., Ex. C ("Housing Court Decision"), ECF No. 97-3. The Housing Court *787 found Steinmetz and his daughters had credibly articulated a legitimate desire to move into the Respondents' apartments, which were on the ground floor-and therefore were easier to reach with strollers and/or young children and could be expanded to accommodate their growing families by renovating the basement-and only a block away from Steinmetz's home. See id. at 2-4. Accordingly, the Housing Court found Steinmetz had instituted the proceedings in good faith, despite the Respondents' testimony, among other challenges, that their apartments had fallen into disrepair only once the building was sold to Jewish owners, of which Steinmetz was the most recent. See id. at 7-11. The Housing Court Decision indicates the Respondents raised their concerns that they were treated less well than their Hasidic neighbors, but the Housing Court nonetheless found Steinmetz was acting in good faith in instituting the eviction proceedings. Id. Having found in Steinmetz's favor, the Housing Court issued warrants of eviction, which were stayed through June 30, 2017, to allow Respondents sufficient time to vacate their apartments. Id. at 14.
II. Procedural History
On December 15, 2016, during the course of the Housing Court litigation, Plaintiffs commenced this action, seeking a permanent injunction prohibiting Defendants from discriminating against them; appointment of a monitor to ensure compliance with court orders and fair housing laws; actual and punitive damages; and costs and attorneys' fees. Compl. at 36. The Complaint specifically alleges Defendants discriminated against Plaintiffs on the basis of their race by (1) failing to provide adequate repairs and heat-in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(b) (Claim One); the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 296(5) (Claim Two); and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(5)(a) (Claim Three) (together, the "Repair claims")-and by (2) intentionally refusing to lease out vacant apartments to them-in violation of the FHA, 42 U.S.C. § 3604(d) (Claim Four), and the Civil Rights Act of 1866, 42 U.S.C. § 1982 (Claim Five) (together, the "Vacancy claims"). See generally Compl.
After the Housing Court Decision, Plaintiffs filed motions before this Court for a temporary restraining order ("TRO"), ECF No. 34, and for a hearing on their preliminary injunction ("PI") motion to prevent Defendants from evicting Respondents, ECF No. 35. This Court granted the TRO pending the hearing and determination of the PI. ECF No. 36. After a two-day evidentiary hearing, from September 11-12, 2017, this Court declined to extend the PI, on October 3, 2017. See Decision & Order, ECF No. 59.
Defendants are now moving for summary judgment on all claims, arguing they are entitled to judgment as a matter of law and fact, based on (1) res judicata and collateral estoppel, (2) statute of limitations, (3) failure to state a claim, and (4) no genuine disputes as to any material facts.[3] The Court now addresses Defendants' motion.
LEGAL STANDARD
Summary judgment is appropriate where "the movant shows that there is no *788 genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" by citation to materials in the record, including depositions, affidavits, declarations, and electronically stored information. Fed, R. Civ. P. 56(a)-(c). Affidavits and declarations, whether supporting or opposing a summary judgment motion, "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Id. ; see also Patterson v. County of Oneida , 375 F.3d 206, 219 (2d Cir. 2004).
"In determining whether summary judgment is appropriate, [the] Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc. , 653 F.3d 156, 164 (2d Cir. 2011) (citation and internal quotation marks omitted). The role of the district court is not to weigh the evidence and determine the truth of the matter, but rather to answer "the threshold inquiry of determining whether there is the need for a trial." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine issue of material fact exists "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy-Wilson v. NOCO Motor Fuel, Inc. , 263 F.3d 208, 212 (2d Cir. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ).
If the moving party carries its preliminary burden, the burden shifts to the non-movant to raise the existence of "specific facts showing that there is a genuine issue for trial." Cityspec, Inc. v. Smith , 617 F.Supp.2d 161, 168 (E.D.N.Y. 2009) (Wexler, J.) (quotation marks omitted) (quoting Matsushita , 475 U.S. at 586, 106 S.Ct. 1348 ). "The mere existence of a scintilla of evidence" in support of the non-movant will be insufficient to defeat a properly supported summary judgment motion. Anderson , 477 U.S. at 252, 106 S.Ct. 2505. Rather, the non-moving party must make a showing sufficient to establish the existence of each element constituting its case. See Celotex Corp. v. Catrett , 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").
When deciding whether this drastic provisional remedy should be granted in a discrimination case, additional considerations should be taken into account. A trial court must be cautious about granting summary judgment to a defendant when his intent is at issue, Gallo v. Prudential Residential Servs., Ltd. , 22 F.3d 1219, 1224 (2d Cir. 1994) (citations omitted). Intent is difficult to prove, and rarely is discrimination evident in documents and papers, necessitating careful scrutiny of testimony by the factfinder "for circumstantial proof which, if believed, would show discrimination." Id.
DISCUSSION
I. Res judicata and Collateral Estoppel
Defendants first argue Plaintiffs' claims are procedurally barred under the doctrines of res judicata and collateral estoppel. For the reasons that follow, this Court holds Plaintiffs' claims are not precluded by the doctrines of res judicata and collateral estoppel
A federal court must apply the rules of preclusion of the state in which the prior judgment was rendered. See, e.g., Kremer v. Chem. Constr. Corp. , 456 U.S. 461, 481-82, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) ;
*789 Sullivan v. Gagnier , 225 F.3d 161, 166 (2d Cir. 2000). The doctrine of res judicata , or claim preclusion, bars relitigating issues that were or could have been raised in a prior action that resulted in a final judgment on the merits. St. Pierre v. Dyer , 208 F.3d 394, 399 (2d Cir. 2000) (citations omitted). Accordingly, a subsequent action is barred if the "earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." EDP Med. Computer Sys., Inc. v. United States , 480 F.3d 621, 624 (2d Cir. 2007) (citation omitted). Critically, the relevant criteria for determining whether causes of action are the same for res judicata purposes, set forth
by both [the Second Circuit] and the New York courts are whether a different judgment in the second action would impair or destroy rights or interests established by the judgment entered in the first action, whether the same evidence is necessary to maintain the second cause of action as was required in the first, and whether the essential facts and issues in the second were present in the first.
Herendeen v. Champion Int'l Corp. , 525 F.2d 130, 133-34 (2d Cir. 1975) (citations omitted); see also Sure-Snap Corp. v. State St. Bank and Trust Co. , 948 F.2d 869, 874 (2d Cir. 1991) (court looks at whether independent judgment would impair first judgment).
Collateral estoppel, or issue preclusion, bars relitigation of ah issue of law or fact that was "actually litigated and determined in the prior suit, regardless of whether it was based on the same cause of action as the second suit." Lawlor v. Nat'l Screen Serv. Corp. , 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). For collateral estoppel to apply, plaintiff must have had a "full and fair opportunity to litigate" the issue at hand, see Irish Lesbian & Gay Org. v. Giuliani , 143 F.3d 638, 646 (2d Cir. 1998), and the determination must have been essential to the judgment, Nat'l Labor Relations Bd. v. United Technologies Corp. , 706 F.2d 1254, 1260 (2d Cir. 1983). "The party seeking the benefit of collateral estoppel has the burden of demonstrating the identity of the issues in the present litigation and the prior determination, whereas the party attempting to defeat its application has the burden of establishing the absence of a full and fair opportunity to litigate the issue in the prior action." Kaufman v. Eli Lilly & Co. , 65 N.Y.2d 449, 456, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985) (citation omitted).
A. Res judicata
As a preliminary matter, the basic premise of res judicata is that parties to a prior action, or those in privity to them, are bound and nonparties are not bound. See South Cent. Bell Tel. Co. v. Alabama , 526 U.S. 160, 167-68, 119 S.Ct. 1180, 143 L.Ed.2d 258 (1999) ; Council v. Better Homes Depot, Inc. , 04-CV-5620, 2006 WL 2376381, at *4 (E.D.N.Y. Aug. 16, 2006) (Garaufis, J.).. Privity requires that a nonparty to an earlier litigation must have had his or her interests adequately represented in the prior proceeding by reason of identity of legal interest or control in the first action. See, e.g., City of New York v. Beretta U.S.A. Corp. , 315 F.Supp.2d 256, 265 (E.D.N.Y. 2004) (Weinstein, J.). Here, Defendants overlook the fact that plaintiffs Sanchez and the Tenants Association were not parties or privies to parties in the prior action in Housing Court-the holdover proceedings initiated against Respondents-and, thus, res judicata is plainly inapplicable to these plaintiffs.
With respect to plaintiff Oyola, who was a party to the Housing Court action, this Court finds res judicata does not bar her instant claims. Oyola was issued *790 a warrant of eviction by the Housing Court after the court found Steinmetz was acting in good faith in terminating her tenancy, and his intent was not discriminatory. This case, in contrast, deals with the Defendants' actions in failing to provide Plaintiffs adequate repairs and services under the FHA, NYHRL, NYCHRL, and refusing to lease vacant apartments to Plaintiffs under the FHA and § 1982, all of which occurred prior to the eviction and do not involve the same cause of action. See, e.g., Reyes v. Fairfield Props. , 661 F.Supp.2d 249, 277-78 (E.D.N.Y. 2009) (Bianco, J.) (holding only plaintiff's unlawful eviction claim was barred by preclusion following a state court judgment issuing a warrant of eviction, and plaintiff's discrimination claims under Fair Housing Amendments Act and NYHRL survived). Defendants' reliance on Springer v. Lincoln Shore Owners, Inc. is overstated because, in that case, the claims brought by plaintiffs in federal court following the city court's judgment of possession and warrant of eviction touched on whether or not the termination of their lease violated federal statutes, the FHA, and the Americans with Disabilities Act ("ADA"). 03-CV-4676, 2007 WL 2403165, at *4 (E.D.N.Y. Aug. 16, 2007) (Block, J.). Here too, as in Reyes , "the Court will not review the validity of the warrant of eviction, but to the extent that the rest of plaintiffs' claims do not hinge on a review thereof, they are not barred from consideration by the Court." 661 F.Supp.2d at 275.
Given these differences, the state court judgment would not have preclusive effect over this case as to Oyola unless Respondents had been required to raise these claims in the state case. Unlike in federal court, New York does not have any compulsory counterclaim rule. See N.Y. C.P.L.R. § 3019(a) ("A counterclaim may be any cause of action in favor of one or more defendants ...."). Because New York's counterclaim rule is permissive, res judicata will not necessarily bar claims that could have been counterclaims in a prior action. See Henry Modell & Co. v. Minister, Elders and Deacons of the Reformed Protestant Dutch Church , 68 N.Y.2d 456, 462 n.2, 510 N.Y.S.2d 63, 502 N.E.2d 978 (1986) ("Our permissive counterclaim rule may save from the bar of res judicata those claims for separate or different relief that could have been but were not interposed in the parties' prior action." (citation omitted) ). Only a defendant who is silent in the first action and then tries to bring a second action that would undermine "the rights or interests established in the first action" is barred under New York's res judicata rule. Id. New York's res judicata rule thus has a narrower effect on a defendant who brings his claim in a separate action than it does on the plaintiff who brings successive claims arising from the same transaction. Eubanks v. Liberty Mortg. Banking Ltd. , 976 F.Supp. 171, 173 (E.D.N.Y. 1997) (Trager, J.).
Although Oyola did allege discrimination as a defense in her holdover proceeding to challenge the propriety of Steinmetz's good faith, a different judgment in this action (i.e. , a judgment in favor of Plaintiffs) would not "impair or destroy rights or interests established by the judgment entered in the first action[.]" See Herendeen , 525 F.2d at 133. Therefore, Oyola's claims in the instant action are not barred by the principles of res judicata.
B. Collateral Estoppel
The Court next turns to whether Plaintiffs' claims are barred by collateral estoppel. The ultimate issue resolved in the holdover proceedings was whether or not Steinmetz's intention in commencing the proceedings met the standard set forth in the N.Y. Rent Stabilization Code § 2524.4(a) and in New York case law placing additional requirements on the *791 owner to show that he instituted the proceedings in "good faith." See Housing Court Decision at 8, 11.
It is not apparent that the Housing Court resolved the same issues now before this Court. The Housing Court decision, which found Respondents' challenges to Steinmetz's good faith were unavailing, did not consider the standards of establishing discrimination under the federal and state statutes pursuant to which Plaintiffs bring their instant claims. See Ayyad-Ramallo v. Marine Terrace Assocs. , 13-CV-7038, 2014 WL 2993448, at *7 (E.D.N.Y. July 2, 2014) (Chen, J.). Furthermore, the jurisdiction of the Housing Court consisted solely of determining whether Steinmetz's eviction proceedings against Respondents were commenced in good faith (i.e. , for the purpose of securing the apartments for his family's use). To that end, the Housing Court specifically acknowledged, although it does have the jurisdiction to make a finding of bad faith, it does not "have the jurisdiction to award equitable relief based upon a finding of discrimination[.]" Decision Denying Stay at 4; see also N.Y. Real Prop. Acts. Law § 747(2) ("The judgment shall not bar an action, proceeding or counterclaim, commenced or interposed within sixty days of entry of the judgment, for affirmative equitable relief which was not sought by counterclaim in the proceeding because of the limited jurisdiction of the court.").
Accordingly, Defendants' motion, insofar as it seeks dismissal of Plaintiffs' discrimination claims concerning repairs and vacancies on the procedural grounds of res judicata and collateral estoppel, is denied.
II. Statute of Limitations
Defendants next argue each of Plaintiffs' claims are procedurally barred by all relevant statute of limitations. Statutes of limitations require "claims be brought promptly to protect the defendant against stale or fabricated claims." Pollis v. New Sch. for Soc. Research , 132 F.3d 115, 119 (2d Cir. 1997). The statute of limitations under the FHA is two years after the occurrence or termination of the alleged discriminatory housing practice, 42 U.S.C. § 3613(1)(A), and three years for the counts under the NYHRL and NYCHRL, Kassner v. 2nd Ave. Delicatessen Inc. , 496 F.3d 229, 238 (2d Cir. 2007) ; N.Y.C. Admin. Code § 8-502(d). For actions pursuant to § 1982, federal courts in New York follow the three-year limitations period set by the state statute of limitations for personal injury actions. See, e.g., Bacon v. Suffolk Legislature , 05-CV-4307, 2007 WL 2288044, at *5 (E.D.N.Y. Aug. 8, 2007) (Bianco, J.); N.Y. C.P.L.R. § 214(5). Plaintiffs filed this federal action on December 15, 2016. Accordingly, contrary to Defendants' assertion that the relevant statutes of limitations dispose of all of Plaintiffs' claims, all claims accruing on or after December 15, 2014 pursuant to the FHA, and all claims accruing on or after December 15, 2013 pursuant to § 1982, NYHRL, and NYCHRL (together, the "Accrual Dates") are timely.
With respect to Plaintiffs' claims prior to the Accrual Dates, dating back to 2011, Plaintiffs argue the Court should construe Defendants' allegedly discriminatory actions as an ongoing or continuing violation-a unified course of conduct "aimed at pushing out non-Hasidic tenants through neglect, harassment, and discriminatory eviction[.]"[4] See Pls.' Opp'n at 14-15. The statute of limitations for certain discrimination claims, including the FHA, can be effectively extended under the "continuing violation" theory, whereby the plaintiff claims not just an isolated *792 violation, but an ongoing policy of discrimination which extend into the limitations period. See Havens Realty Corp. v. Coleman , 455 U.S. 363, 381, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) ; Patterson v. Cnty. of Oneida , 375 F.3d 206, 220 (2d Cir. 2004). Where it applies, the doctrine delays "commencement of" the statute of limitations period... until the last discriminatory act in furtherance of the alleged discriminatory policy. Shomo v. City of New York , 579 F.3d 176, 181 (2d Cir. 2009) (citation and internal quotation marks omitted). "However, courts in the Second Circuit 'have been loath to apply [the continuing violation doctrine] absent a showing of compelling circumstances.' " Grimes v. Fremont Gen. Corp. , 785 F.Supp.2d 269, 292 (S.D.N.Y. 2011) (Karas, J.) (citation omitted); see also Petrosky v. N.Y. Dep't of Motor Vehicles , 72 F.Supp.2d 39, 48 (N.D.N.Y. 1999) (Homer, M.J.) ("The continuing violation doctrine is disfavored in this circuit." (collecting cases) ).
In the housing context, courts have applied the continuing violation theory "where the type of violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." Pantoja v. Scott , 96-CV-8593, 2001 WL 1313358, at *11 (S.D.N.Y. 2001) (Peck, M.J.) (internal quotation marks and citations omitted); see, e.g., E. Paralyzed Veterans Ass'n v. Lazarus-Burman Assocs. , 133 F.Supp.2d 203, 212-13 (E.D.N.Y. 2001) (Spatt, J.) (continuing violation found where a housing complex had an ongoing policy of excluding and failing to accommodate disabled individuals). Conversely, courts have held the continuing violation theory does not apply where a plaintiff was on notice of what she believed was discrimination but "fail[ed] to act in preservation of her rights in spite of her knowledge[.]" Petrosky , 72 F.Supp.2d at 52-53 ("This inquiry necessarily involves asking when a layperson, not trained in the law, would have been aware of her right and duty to assert her legal claim.").
The record here demonstrates Plaintiffs were indeed on longstanding notice of what they believed was discrimination based on their race, at least as early as 2011. Plaintiff Oyola testified during her deposition that she first, felt she was being discriminated against before Defendants owned the building, but felt more discriminated against since 2011 when the Housing Court proceedings commenced. Waltz Decl. Ex. L 56:8-57:7, ECF No. 102-4. Plaintiff Sanchez testified that she believed Hispanics began getting treated differently when a prior Hasidic Jewish owner purchased the building, and around 2005 to 2007, she knew Hispanics were being discriminated against because they began to suffer from a lack of heat, hot water, and no repairs. Waltz Decl. Ex. J 83:3-84:23, ECF No. 102-2. Plaintiffs' own statements establish that at least as early as 2011, when the Housing Court proceedings commenced against Respondents, they knew they were victims of allegedly discriminatory conduct, but failed to act until 2016. Plaintiffs are now precluded from bringing claims dating back to 2011 on the continuing violation theory. Therefore, all claims prior to the aforementioned Accrual Dates-December 15, 2014 for the FHA claims, and December 15, 2013 for the claims under § 1982, NYHRL, NYCHRL-are dismissed.
III. Failure to State a Claim
Turning to Defendants' arguments on the merits, Defendants argue Plaintiffs have failed to state any viable claim for relief on two grounds. First , Defendants argue all of Plaintiffs' remaining claims fail because Plaintiffs cannot prove that Defendants' challenged actions were motivated *793 by discrimination. Second , Defendants argue Plaintiffs' Vacancy claims fail as a matter of law because Plaintiffs do not allege a violation of the FHA or § 1982. This Court addresses each argument in turn.
A. Defendants' Knowledge of Plaintiffs' Ethnicities
In proving a prima facie case of housing discrimination, a plaintiff has the ultimate burden of proving, by a preponderance of the evidence, the defendant's challenged actions were motivated by discrimination. Mitchell v. Shane , 350 F.3d 39, 49 (2d Cir. 2003). Without some evidence of the defendant's knowledge of a plaintiff's racial identity, it is impossible to infer such motivation. Id. As such, "[s]ummary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination." Id. at 47. A plaintiff can establish her burden of showing a defendant was aware of her racial identity by alleging information to show that a defendant's agent was aware of such identity. See Hughes v. Lillian Goldman Family, LLC , 153 F.Supp.2d 435, 450-52 (S.D.N.Y. 2001) (Koeltl, J.).
Defendants assert there is no evidence of Defendants' know edge of Plaintiffs' racial identities. In response, Plaintiffs cite to ample evidence in the record supporting the conclusion that Defendants' agents (the management companies whom Defendants hired), Steinmetz's daughter, and Steinmetz himself knew Plaintiffs were not Hasidic. See Pls.' Facts ¶ 6. It is undisputed the parties first saw each other at the Housing Court trial in 2016. However, rendering all facts in the light most favorable to Plaintiffs, it is more than possible Defendants knew, or at least suspected, Plaintiffs were not Hasidic. Accordingly, the Court finds there is sufficient evidence by which a reasonable factfinder could reach the conclusion that Defendants' challenged actions were motivated by discrimination and denies Defendants' motion to the extent it seeks to dismiss all claims for failure to state a viable claim for relief.
B. Vacancy Claims
Plaintiffs' Vacancy claims are based on Defendants' alleged violations of § 3604(d) of the FHA and 42 U.S.C. § 1982. FHA § 3604(d) prohibits representing "to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." Section 1982 of Title 42 guarantees: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."
In establishing a prima facie case for housing discrimination under the FHA and § 1982, Plaintiffs must prove: (1) they are members of a protected class; (2) they sought and were qualified to rent an apartment; (3) they were denied an opportunity to rent the apartment; and (4) the apartment remained available to other renters or purchasers. See Mitchell , 350 F.3d at 47. The Court agrees with Defendants that Plaintiffs cannot support a claim that they ever sought an apartment and were then denied the opportunity to rent an apartment from Defendants, as Plaintiffs have already testified to that effect. Sanchez explicitly denied applying for any vacant unit. Although Oyola testified she had inquired with an agent of Steinmetz regarding the availability of apartments, this conversation was purported to have been in 2011 or 2012, plainly outside of the statute of limitations, as discussed supra. No other evidence suggests Plaintiffs *794 sought to rent an apartment from Defendants and were thereafter denied such opportunity.
Plaintiffs argue they are nevertheless entitled to interracial association and have standing to pursue claims based on Defendants' preferential treatment of Hasidic individuals for rentals. Pls.' Opp'n at 20 (citing Otero v. N.Y.C. Hous. Auth. , 484 F.2d 1122, 1134 (2d Cir. 1973) ). As Defendants proffer, Plaintiffs' reliance on Otero is indeed misplaced, and Otero has no relevance to this case. As clarified in United States v. Starrett City Associates , " Otero established for this Circuit that a race-conscious rental policy adopted to promote integration does not violate Title VIII and that a defendant must be afforded an opportunity to demonstrate at a trial that its rental policy is needed to prevent a housing complex from becoming segregated." 840 F.2d 1096, 1108 (2d Cir. 1988). Such a rental policy is not at issue in this action.
Plaintiffs also assert their Vacancy claims survive under the futile gesture theory, under which a member of a protected class' failure to apply for an apartment does not prejudice her claims where: (1) Plaintiffs are members of a protected class who are potential renters and financially able to rent; (2) Defendants discriminated against people of Plaintiffs' race; (3) Plaintiffs were reliably informed of the policy of discrimination and would have taken steps but for the discrimination; and (4) Defendants would have discriminated against Plaintiffs had they applied. Pls.' Opp'n at 20 (citing Pinchback v. Armistead Homes Corp. , 907 F.2d 1447, 1451-52 (4th Cir. 1990) ). Although this theory, first applied in the employment discrimination context in Intl. Brotherhood of Teamsters v. United States , 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), has not been addressed by the Second Circuit in the housing discrimination context, this Court finds extension of the theory for analysis is appropriate. As an initial matter, "[f]air employment concepts are often imported into fair housing law ... [and] similarities [between the statutes] have traditionally facilitated the development of common or parallel methods of proof when appropriate." Pinchback , 907 F.2d at 1451. Further, the Second Circuit has recognized the "futile gesture" theory in other contexts beyond employment discrimination. See Malarkey v. Texaco, Inc. , 983 F.2d 1204, 1213 (2d Cir. 1993) (applying futile gesture doctrine to ADEA claim); Kreisler v. Second Ave. Diner Corp. , 731 F.3d 184, 189 (2d Cir. 2013) (explaining the ADA mandates that disabled individuals need not engage in a "futile gesture" where there is "actual notice" an entity would engage in disability discrimination).
However, courts have expressed concern about the application of Teamsters to cases where the inference of discrimination is unduly speculative. As the Second Circuit explained in Brown v. Coach Stores , "the leniency afforded individual plaintiffs [in Teamsters ] ... hinged on an initial finding of a history of discrimination by the employer to the class of plaintiffs." 163 F.3d 706, 711 (2d Cir. 1998). In cases where there is no class-wide finding of discrimination, application of the futility rule is more problematic. In addressing futile gestures in terms of standing generally, the Second Circuit has recognized, "[a]lthough the ripeness doctrine does not require 'a futile gesture as a prerequisite for adjudication in federal court,' conclusory or unsupported allegations of futility will not suffice." Safe Harbor Retreat, LLC v. Town of E. Hampton , 14-CV-2017, 2015 WL 918771, at *5 (E.D.N.Y. 2015) (Wexler, J.) (internal citations omitted), aff'd , 629 F. App'x 63 (2d Cir).
In the case at bar, Plaintiffs have not established their burden of proving they were "reliably informed" of discriminatory *795 policies where they did not have any direct contact with Defendants or their agents-a prerequisite to establishing direct injury under the futile gesture theory. See McClain v. Am. Econ. Ins. Co. , 424 F.3d 728, 733 (8th Cir. 2005). Because there is no indication that Plaintiffs were "reliably informed" of any discriminatory policy with respect to Defendants' leasing out vacant apartments, they did not have actual notice that Defendants would engage in discrimination, Any allegation of futility is conclusory and unsupported, and Plaintiffs' reliance on the "futile gesture" theory fails as a matter of law. As such, Plaintiffs* Vacancy claims (Claims Four and Five) are dismissed.
IV. No Genuine Disputes as to Any Material Facts
Lastly, Defendants argue Plaintiffs' claims should be dismissed because there are no genuine disputes of material fact, and summary judgment is appropriate as a matter of law.[5]
FHA § 3604(b) prohibits race-based discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." NYHRL and NYCHRL housing discrimination claims are analyzed under the same standard as claims made under the FHA. See, e.g., Haber v. ASN 50th St. LLC , 847 F.Supp.2d 578, 588 (S.D.N.Y. 2012) (Marrero, J.). As clarified, § 3604(b) prohibits, inter alia , "[f]ailing or delaying maintenance or repairs of sale or rental dwellings," "[l]imiting the use of privileges, services or facilities associated with a dwelling," or "[s]ubjecting a person to harassment" on the basis of race. 24 C.F.R. §§ 100.65(b)(2), (4), (7).
Housing discrimination claims are analyzed under the McDonnell Douglas burden-shifting framework used to evaluate Title VII employment discrimination claims. See Mitchell , 350 F.3d at 47. First, the plaintiff must establish a prima facie case of discrimination. Id. (citing McDonnell Douglas Corp. v. Green , 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ). Then, the burden shifts to the defendants to produce a legitimate, non-discriminatory reason for their actions. Id. (citation omitted). If the defendants make such a showing, the burden shifts back to the plaintiff to demonstrate defendants' proffered reason is pretextual, and discrimination was the real reason for the defendants' actions. Id. (citation omitted). A plaintiff's initial burden of proof to demonstrate a prima facie case of discrimination is minimal. See Quaratino v. Tiffany & Co. , 71 F.3d 58, 65 (2d Cir. 1995) ; Khalil v. Farash Corp. , 260 F.Supp.2d 582, 588 (W.D.N.Y. 2003) (Larimer, J.) (noting plaintiffs may establish their initial burden by making a "modest showing" that they were "not provided the same services or facilities in connection therewith made available to others under circumstances giving rise to a reasonable inference of prohibited discrimination" (citation omitted) ).
The Court finds Plaintiffs have carried their initial burden in establishing potential violations of housing discrimination laws during the relevant time period (following the Accrual Dates). Indeed, the record contains evidence representing the current conditions of their apartment, which, considering all facts in the light most favorable to Plaintiffs, are dilapidated and potentially dangerous. As of September *796 11, 2017, all open city violation records for the Building were for the apartments occupied by Plaintiffs and former plaintiff Santiago. See N.Y.C. Housing Maintenance Code § 27-2002 (establishing code as minimum standards of health and safety). And, as the Court has found supra , there is sufficient evidence by which a reasonable factfinder could reach the conclusion that Defendants' challenged actions were motivated by discrimination.
Since Plaintiffs have stated a prima facie claim, the burden falls on Defendants to proffer legitimate reasons for their actions. While Defendants argue they have satisfied this burden by proving in Housing Court that Steinmetz's intention was to recover the Building for his family's use, as this Court has discussed, the Housing Court's determination on Steinmetz's intent was limited to his commencing the holdover proceedings. Here, Defendants have failed to set forth nondiscriminatory reasons for their failure to provide adequate accommodations and repairs, as alleged in the Complaint. With respect to the ultimate issues remaining in the case, specifically Defendants' motivations behind the alleged violative conduct, material issues of fact exist, which must be adjudicated by a factfinder.[6] And this Court must tread lightly in deciding whether summary judgment should be granted in a discrimination case that turns on intent. "It is the rare occasion when discrimination boldly smacks one in the face, rather, it is 'often accomplished by discreet manipulations and hidden under a veil of self-declared innocence.' " Fair Hous. Justice Ctr., Inc. v. Edgewater Park Owners Co-op. , 10-CV-912, 2012 WL 762323, at *8 (S.D.N.Y. 2012) (Patterson, J.) (citing Rosen v. Thornburgh , 928 F.2d 528, 533 (2d Cir. 1991) ). Defendants' motion to dismiss the remainder of Plaintiffs' claims is therefore denied.
CONCLUSION
For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Claims One, Two, and Three remain to the extent they accrued on or after December 15, 2014 for the FHA claim, and on or after December 15, 2013 for the NYHRL and NYCHRL claims. Claims Four and Five are dismissed in their entirety. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 96.
SO ORDERED.

Kathleen Santiago submitted a notice of settlement of her claims, and this Court dismissed her as a plaintiff from the action on October 25, 2017. Order of Dismissal, ECF No. 67.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. The Court takes to be true facts stated in a party's Rule 56.1 statement that are supported by testimonial or documentary evidence and denied by the other party with only a conclusory statement without citation to conflicting testimonial or documentary evidence. See E.D.N.Y. Local Rule 56.1(c), (d),

Defendants' motion was fully briefed and submitted to this Court on March 6, 2018. See Defs,' Mem. in Support of Mot. for Summ. J., ECF No. 96-1; Pls.' Mem. in Opp'n ("Pls.' Opp'n"), ECF No. 99; Defs.' Mem. in Reply, ECF No. 102. On May 18, 2018, this Court granted the parties' request to file supplemental papers, which were completed on July 3, 2018. See Defs.' Supp. Mem. in Support of Mot. for Summ. J. ("Defs.' Supp."), ECF No. 122; Pls.' Supp. Mem. in Opp'n, ECF No. 126; Defs.' Supp. Mem. in Reply, ECF No. 127.

As discussed supra , to the extent plaintiff Oyola's claims are founded upon a theory of discriminatory eviction, they are barred from re-litigation.

Because the Court has ruled supra that Plaintiffs' Vacancy claims are dismissed and only Plaintiffs' Repair claims which accrued on or after December 15, 2014 for the FHA claims and on or after December 15, 2013 for the NYHRL and NYCHRL claims survive, the Court hereinafter addresses only the remaining claims.

Credibility determinations are also the function of the jury, not the judge. Redd v. N.Y. Div. of Parole , 678 F.3d 166, 174 (2d Cir. 2012). In an attempt to discredit Plaintiffs' repair claims, Defendants argue Plaintiffs' credibility has been undermined by deposition testimony. See Defs.' Supp. at 9-10. Defendants' request for credibility determinations tacitly acknowledges and provides further support for this Court's finding that there are material facts in dispute and summary judgment on Plaintiffs' repair claims is not appropriate. See Redd , 678 F.3d at 174 ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate," (citing Fed. R. Civ. P. 56(e) Advisory Committee Note (1963) ) ).